## WOLFF et al. v. STEWART & CO.
### No. 2477.

District Court, D. Maryland.

Nov. 3, 1937.

Morton H. Rosen, of Baltimore, Md., and Herbert A. Baker, of Boston, Mass., for plaintiffs.

Barton, Wilmer, Bramble, Addison & Semans, and F. Fulton Bramble, all of Baltimore, Md., and Semmes, Keegin & Semmes, Harry H. Semmes, and S. Warwick Keegin, all of Washington, D. C., for defendant.

CHESNUT, District Judge.

The patent here in suit has recently been held invalid for want of invention in view of the prior art by the Circuit Court of Appeals for the First Circuit in Jordan Marsh Co. v. Wolff, 80 F.(2d) 314, reversing a decree of the District Court reported in 9 F.Supp. 516, which held the patent valid and infringed. It is, however, contended for the plaintiffs here that the present case presents another and different

record and requires independent judgment, and this position seems to be clearly correct. The defendants in the two cases are different. Although the manufacturer of the alleged infringement is the same it is not shown that he was a party to the former case, or bound by the decree. There is but one claim in the patent. Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L. Ed. 949.

■ There are no other federal cases as to the patent. The decision in the First Circuit is not imperative authority here although it is certainly entitled to great weight as highly persuasive; and it has been generally customary in this district to follow a decision of the Circuit Court of Appeals of another Circuit plainly in point and decisive of the case in the absence of other federal decisions of equal dignity. And this custom, I think, should find particular application in patent cases which are wholly a matter of federal law unaffected by conditions arising from any local law or custom. Beach v. Hobbs, 92 F. 146, 147 (C.C.A.1); Bellows-Claude Co. v. Sun Ray Corporation (D.C.) 39 F.(2d) 907, 913; Mast, Foos & Co. v. Stover Co., 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856; Imbrovek v. Hamburg-American Steam Packet Co., 190 F. 229, 233 (D.C.Md.).

The general nature of the patent is succinctly described by Circuit Judge Morton in his opinion for the First Circuit as follows:

"The patent relates to a kind of underclothing in which the body and leg portions are combined into a single garment, called a 'union suit.' Such garments had been in common use for many years before the Wolff application was filed. They must be so fashioned that, for toilet purposes, the seat portion can be let down or pushed aside. The Wolff patent deals with this part of the garment. In his construction the top of the seat portion is loose at the back of the waist and permanently fastened at the sides, and is given such fullness that it can be pulled down when the wearer goes to the toilet. It is retained in normal position by an elastic tape carried in a hem at the upper edge of it and fastened at the sides of the waist. The stretching of the elastic in connection with the fullness allows the seat portion to be pulled down and the pressure of the elastic returns it into position when the pull is removed. There are no buttons. * * *

"The first question is whether the patent shows invention over the prior art. There was little controversy as to the facts. The oral testimony about the prior art was for the most part uncontradicted, and the prior patents speak for themselves."

After reviewing the prior art and particularly the patents to Greenwald in 1914, to Kline in 1916 and to Kassap in 1926, the opinion continued:

"Wolff took the loose baggy seat of Kassap's patent and modified the support for it by running the elastic tape all the way across the top and doing away with the auxiliary buttons. The question is whether this constituted invention. * * * Aside from the great commercial success of the Wolff garment, it would seem too clear for discussion that the change which he made did not involve invention. * * * The weight to be given commercial success on questions of invention depends on the circumstances surrounding it. *. * * * The recent commercial success of the Wolff garments appears to be due to the improvement in elastic tapes. The change which he made seems to us to have been obvious; not taken by others because owing to the poor quality of elastic then obtainable there was no practical merit in it."

The gist of the opinion was that the patent clearly lacked invention and could not be made valid merely by success attributable to a later improvement in elastic bands rather than to the intrinsic merit of the patent. After the decision the plaintiff-appellee moved for a re-argument on the ground that the court's conclusion on this point was not justified from the record as a whole, and in support of the motion affidavits of several witnesses were filed to the general effect that the early lack of success of the patent (later followed by marked success) was not due to the poor quality of elastic tape at the time of the issuance of the patent, but rather to the early failure of the trade to realize the merits of the invention; but the petition for re-hearing was denied without further opinion.

The present case has been submitted for decision after full testimony and hearing. Counsel for the plaintiffs have furnished me with a printed copy of the record in the former case, and after reading it and comparing the testimony with that submitted in the present case, I find there is but one difference of importance, and that

with regard to this disputed question of the cause for the present commercial success of the patent.

From the testimony in the instant case I find that there has been an important improvement in commercially used elastic bands for underwear which became effective generally in the trade about 1933, two or three years after the issuance of the Wolff patent No. 1,787,098, December 30, 1930. From the testimony of Professor Rice of the Chemistry Department of the John Hopkins University it appears that prior to 1924 chemical scientists had discovered that a slight molecular change in certain substances, including rubber, effected a very material increase in their resistance to oxidation. The nature of the change and its causes at first baffled the chemists and it was not for quite some time thereafter that the discovery could be given practical application in the industrial field. However it was applied in the manufacture of rubber beginning about 1930, and the improved product came into very general use about 1933. It is known to the trade as the anti-oxidation of rubber. The deterioration in the effective elastic properties of rubber bands used in underwear was due largely to the process of oxidation of the rubber. Prior to 1931 this was overcome to some extent by the insulating of the rubber itself by a cotton covering usually in braided form but later somewhat improved when put into woven form although the braided form is still used very largely and satisfactorily. The anti-oxidating process in the manufacture of rubber has materially increased its effective life so that it retains its elasticity much longer now than some years ago. The effective life of elastic bands in undergarments prior to 1930 was hardly more than a year, and if the garments were retained on the shelf for that period before sale many of them would become practically unusable by reason of the almost entire loss of elasticity, and similarly if promptly sold and put into use with the possibly accelerated deterioration from wear and laundering, they soon required replacement. The new process of manufacture has greatly extended the useful life of the elastic bands.

While the plaintiffs in this case do not dispute the fact that the durable quality of elastic bands has been materially improved in recent years, they do vigorously dispute defendant's contention (which was adopted in the First Circuit case) that the present commercial success of the invention is attributable to the recent improvement in the manufacture of rubber; and much testimony has been submitted in this case to the effect that there was no general sales resistance to undergarments containing elastic bands on account of their inherent poor quality prior to 1930; and therefore the inability of the appellee Wolff to interest the manufacturers of undergarments in his patent prior to 1933 was not at all due to the defective quality of the elastic bands then in commercial use but resulted from the failure to appreciate the value of his device. On this point the following facts appear.

Wolff was by occupation a custom shirt maker. For his personal use he preferred union suits for underwear but disliked the then currently used buttons in the back. He experimented on a make of garment which would substitute an elastic band to hold the drop seat back portion of the garment in place for normal wear. He finally hit upon the device which is incorporated in the patent issued to him, and accordingly made a number of garments which he personally wore to his satisfaction. After perfecting his particular type of union suit and applying for a patent he endeavored to interest various manufacturers of underwear in its adoption, but obtained no encouragement from any of them over a period of two or three years. Only one assigned dissatisfaction with the quality of elastic bands as the reason for his refusal.

It will be noted that Wolff's own idea was that his device was suitable for garments for adult men and he apparently gave no thought to its possibilities for very young children. In the meantime a Mr. Craig (now of the Craig-Musgrove Co., the licensee of the Wolff patent) then connected with the underwear firm of Dalby & Co., was experimenting with the development of a buttonless elastic band union suit for young children. He devised a garment on which he secured a patent but which proved entirely unsaleable because too complicated (Patent No. 1,794,349, February 24, 1931). In his patent research he ran across the Wolff patent and was so impressed by it that he devised a slightly different garment which he thought would serve the same purpose but would escape infringement, and obtained the patent therefor, No. 1,911,676, May 30, 1934. The Dalby Company successfully manufactured and sold childrens' garments un-

der this patent; but for other reasons Craig's association with it terminated and he then organized the Craig-Musgrove Co., which in 1933 became by mesne assignments the exclusive licensee of Wolff, and since then has been engaged continuously in the manufacture of childrens' underwear thereunder, and has with authority granted sublicenses to a number of other manufacturers of similar under garments. The total production of the Craig-Musgrove Co., and its sub-licensees from 1933 to 1935, both inclusive, was nearly 3,000,000 garments, and since then up to the present time the Craig-Musgrove Co., for itself has produced about 470,000 of the garments. At the present time this type of garment for very young children has practically superseded the former button button variety. Some of the large underwear manufacturers who originally refused to interest themselves in Wolff's garment (presumably offered to them for adult wear) have since accepted sub-licenses from the Craig-Musgrove Co., and make the type of garment for young children. Wolff's garment has, however, made practically no headway in the field of union suits for adults. Wolff has acquired the Kassap patent.

I find from the weight of the testimony in the present case that the early rejection of Wolff's device was not, principally at least, assignable to the then poor quality of elastic bands. On the other hand it does not follow that its present commercial success is due to the intrinsic merits of the device. The weight of the testimony in the case would seem to be that its present favorable reception by the public is due to what is described as an educational campaign for the welfare of children and the relief of the mothers in teaching the children at an early age to manage their own clothing which they are enabled to do more easily when the seat portion of the garment is held in place by an elastic band than when buttons are used in the back. This educational process was begun by the Thomas Dalby Co., when Craig was associated with it, by somewhat extensive advertising portraying the advantages of teaching the children to help themselves, under the catch phrases "Self Help" and "Me Do," aided in large part, no doubt, by more general and disinterested publicity given by social welfare advice. And to this should be added, as one of the witnesses for the plaintiff in this case put it, substantial improvements in the manufacture of the garments. It is also said that while

initially the cost of manufacture of this particular type of garment was greater than that of the button variety, its subsequent large mass production, with its simplified method of construction, has made the cost less than for other types of similar garments. It is also quite probable that the improved elastic bands have been a very favorable factor in its recent wide use. It seems reasonably probable that the present commercial success is due more to the educational campaign which, in a measure has changed the habits of mothers and young children, than necessarily to the intrinsic merits of the Wolff garment as compared with previous types of under garments. And in judging what measure of contribution Wolff made to the art, it must be borne in mind that he apparently had no thought of the adaptability of his garment particularly for children, the possibilities of which were seen by Craig and not by Wolff.

Any significance of commercial success in this case is very uncertain. While it may be considered (Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486, 23 L.Ed. 952), it is of little if any value except where the existence of invention is otherwise in doubt. Thropp's Sons Co. v. Seiberling, 264 U.S. 320, 44 S.Ct. 346, 68 L.Ed. 708; Minerals Separation Corporation v. Magma Copper Co., 280 U.S. 400, 50 S.Ct. 185, 74 L.Ed. 511; Wine Railway Appliance Co. v. Baltimore & O. R. Co., 78 F.(2d) 312, 314 (C.C.A.4); Ottenheimer Bros. v. Libuwitz, 87 F.(2d) 190 (C.C.A.4); Rokap Corporation v. Lamm, 10 F.Supp. 219, 223 (D.C.Md.) affirmed (C.C.A.) 85 F.(2d) 873, 874. "It must be strongly emphasized that, if the Court feels certain that there is no invention present, commercial success is irrelevant and will not be considered. For, commercial use is utilized to resolve a doubt in favor of invention and patentability and not to raise a doubt when none exists." Rivise and Caesar on Patentability and Validity, p. 311. It is reasonably inferable from the testimony in this case that the present measure of success enjoyed by the patent is attributable not to the demand of the trade for an article for which there had been a long felt want, but to the education of the public to want a device which in principle had long been at hand.

That the elastic band as arranged by Wolff did not rise to the dignity of invention is, in my opinion, free from reasonable doubt. It marked no substantial discov-

ery or invention over what had long been known and practiced in the underwear art. Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438; Smith v. Magic City Club, 282 U.S. 784, 792, 51 S.Ct. 291, 294, 75 L.Ed. 707; Maibohm v. R C A Victor Co., 89 F.(2d) 317, 321 (C.C.A.4). Wolff did not devise the union suit in general nor the drop back seat variety of a union suit, both of which had long been in use. The only substance of his idea was to substitute an elastic band for the previously used buttons, but even this idea was not new as Kline had previously patented an arrangement for the drop seat which dispensed with buttons, and relied on the intrinsic elasticity of knitted material to return the seat portion of the garment to its usual position and hold it there after being intentionally lowered for a particular purpose; and Kassap's patent also discloses the substitution of an elastic band inserted in the top edge of the drop seat in lieu of one or more of the usual buttons. Moreover there was wide use of elastic bands for underwear, particularly for women's wear, for many years before 1930; and the function of the elastic bands so used was to permit the proper adjustment of the garment to the body upon putting it on, and thereafter to hold it in its proper place; and substantially the same function is performed by the band in the present case.

While the patent is entitled to a presumption of validity from its grant, a critical examination of the file wrapper strongly tends to overcome the presumption in this case. The elastic band was the principal feature of the patent that seemed worthy of discussion in the First Circuit case, and the contents of a letter from Wolff to his patent attorney forwarded to the Patent Examiner tends to support that view, as he therein refers to the elastic band as his invention although he also distinguishes certain features of his construction from prior patents. It is here claimed, however, that the patent really consists in a particular combination of which the band is only one element. The one claim finally allowed reads as follows:

"A union suit comprising front, back and posterior sections, the back section terminating above the crotch portion of the front section and stitched along side edges of the front section for the full depth of the back section, the posterior section overlapping the lower portion of the back section and stitched along its side edges to side edges of the front section and the overlapped portion of the back section, *a marginal casing being formed across the upper end of the posterior section for the full width thereof, and an elastic band within said casing stretched and having its ends secured at the ends of the casing,* said casing being secured at its ends with seams connecting the front and back sections and free from the back section for the remainder of the length."

Upon analysis it appears that the combination consists of (1) the features of the elastic band (described in the supplied italics) and (2) the relative arrangement of the three separate pieces of the material of the garment and the stitching of them together. There is certainly nothing novel in the second element. Seams and stitching are common features in all underwear; and, as said by Judge Morton, "whether a shirttail should be longer or shorter does not involve patentable invention." The combination as such produced no new result. Whatever merits the garment has resides in the particular arrangement of the elastic band. Powers-Kennedy Corporation v. Concrete Co., 282 U.S. 175, 186, 51 S.Ct. 95, 99, 75 L.Ed. 278; Demco v. Doughnut Machine Corporation, 62 F.(2d) 23, 26 (C. C.A.4); Victor Cooler Door Co. v. Jamison Cold Storage Door Co., 44 F.(2d) 288 (C.C.A.4).

The original application for the patent contained two claims in both of which the elastic band was described as "an elastic band within said casing of less length than the length of said casing"; and the described formation of the garment was not materially different from that in the claim as finally allowed. The claims were rejected "as presenting nothing of substance over Kassap." The applicant then cancelled both claims and substituted claim 3, which, with only minor verbal changes, was the same as the claim finally allowed; but the Examiner again rejected it "as setting forth nothing patentable over Kassap in view of Kline, both of record." At a subsequent personal conference the patent attorney for the applicant seems to have succeeded in convincing the Examiner that there was some patentable difference between the finally allowed claim and the construction of the Kline and Kassap garments, and the patent was allowed. But it is apparent that the differences were meticulous, and the basis of the patent very narrow indeed. It seems clear that the particular construction of the garment in-

volved no important advance in the art and affords no basis for monopoly in the use of an elastic band in lieu of buttons on a garment of this variety. What Wolff devised was not beyond the skill of the competent artisan. Smith v. Magic City Club, 282 U.S. 784, 792, 51 S.Ct. 291, 294, 75 L. Ed. 707.

In support of the patent counsel urge that invention is shown by various objective tests said to be here present, in addition to commercial success, such as the failure of the prior art patents to achieve success, that Wolff took the final step to success, that others tried and failed, and that the trade at first rejected but later accepted the particular garment. The weight of any or all of these must vary with the controlling circumstances of the particular case, and what has already been said sufficiently indicates why they are not here convincing. While the objective tests of patentability are helpful and should be fairly considered, the final judicial test is necessarily subjective. This was well expressed by Judge Learned Hand. "There comes a point when the question must be resolved by a subjective opinion as to what seems an easy step and what does not. We must try to correct our standard by such objective references as we can, but in the end the judgment will appear, and no doubt be, to a large extent personal, and in that sense arbitrary." Kirsch Mfg. Co. v. Gould Mersereau Co., Inc. (C.C.A.) 6 F.(2d) 793, 794.

But even if the patent could be held valid, I do not find infringement. And as the case will probably be appealed it may possibly be useful to briefly consider that point in the case, which was not passed on by the First Circuit Court of Appeals.

The garment particularly attacked as an infringement in this case has some differences in construction from that involved in the First Circuit case. Both garments were made by the Elliott Mfg. Co., of Manchester, N. H., the one in the former case being sold by it to Jordan Marsh Co., of Boston, and that in this case, to Stewart & Co., of Baltimore, both well-known department stores. For convenience the former may be referred to as the Boston garment and the latter as the Baltimore garment. Both were made entirely from knitted material as indeed are the garments of the plaintiffs' manufacture. The claim of Wolff's patent is not limited to any particular form of fabric, woven or knitted, although the drawings show a woven material, and Wolff himself used that in the garments which he personally constructed. It is said that knittted material is now almost universally used in this type of garment and is so used by the Craig-Musgrove Co., and generally by its sub-licensees as well as by the Elliott Mfg. Co., and other manufacturers of this general type of underwear. In the plaintiffs' garment three separate pieces of material are sewed together as described in the Wolff patent; but in the Boston garment made by the Elliott Mfg. Co., the body of the garment, instead of being composed of two separate sections, a front and a back, was cut out of one piece of tubular knitted material which, however, at the sides longitudinally had a superimposed "mock" seam in place of the real seam of the plaintiffs' garments, and as called for in the patent. It is said that the seam, real or mock, gives extra strength to take up strains on the garment when worn, from the hips to the shoulders of the wearer. Other than this difference the plaintiffs' garments and the Boston garment were substantially the same. But in the present case the garment sold by Stewart & Co. was constructed from three separate pieces of knitted material with the genuine and not a mock seam and is therefore in this respect precisely like the plaintiffs' garment. The defendant's testimony in the case is, however, that this particular garment is not the type usually made and sold by the Elliott Mfg. Co., and that only eight dozen thereof were sold to Stewart & Company, while about three hundred dozen garments having the same kind of elastic band but of a still different body construction, were sold by the Elliott Company to Stewart & Company. A sample of this third type of garment was offered in evidence by the defendant, and marked for identification as Defendant's Exhibit E, but on the plaintiffs' objection was not admitted, as plaintiffs' counsel were not prepared to attack it as an infringement of the patent combination, the upper body portion being all of one piece and having no seams, real or mock. It is not suggested in this case that this "Baltimore garment" (that is the one made from three pieces, like the plaintiffs') was designed for the purpose of deceptive similarity to the plaintiffs' garments, the explanation being that its particular construction was due to the fact that the Elliott Company at times did not have a sufficient number of tubular machines for its total production.

The plaintiffs' contention is that as there is no apparent difference to the purchaser between the Baltimore and Boston types of the Elliott garment, and as the mock seam is apparently identical with the real seam and not distinguishable therefrom except by cutting the garment apart, there should be no difference on the issue of infringement as between the two garments. The defendant contends that even if the patent is valid neither garment infringes because the Baltimore garment does not have the elastic band *stretched* within the casing; and the Boston garment is not an infringement for that reason, and also because the body portion, front and back, is made from only one piece of knitted material and with a mock and not a real seam.

The significance of the non-stretched condition of the elastic band arises from the particular wording of the amended claim as finally allowed, in which the band is described as "an elastic band within said casing *stretched* and having its ends secured at the ends of the casing." (Italics supplied.) The reason for including the word "stretched" in this phrase of the patent claim is admittedly difficult to understand. It will be remembered that in the claim as originally phrased the description of the elastic band was "an elastic band within said casing of less length than the length of said casing." The substituted claim in this respect reads as follows: "An elastic band within said casing stretched and secured adjacent the ends of the casing." This was subsequently verbally amended to read: "An elastic band within said casing stretched and having its ends secured at the ends of the casing." In supporting the application for the patent with the amended claim, the applicant's patent attorney said:

"A strip of elastic 8 extends through a pocket for the full length thereof and this strip is stitched slightly *so as to provide tension* and has its ends secured at the ends of the pockets," etc. (Italics supplied.)

This seems to mean that the band as inserted before the garment is worn is under tension, that is, stretched. An inspection of the several garments introduced into evidence as made for the plaintiff and the defendant shows that the elastic band as a matter of fact is not stretched, that is under tension, so far as is discernible. Plaintiffs' counsel contends that the word "stretched" as used in the patent claim does not necessarily have the meaning of extended in length by stretching but only the meaning of extension from point to point, as a non-elastic rope is stretched across a room; and if this is not a permissible construction, nevertheless the stitching of the band integral with the material of the casing necessarily causes some slight tension and stretching in the garment even before it is worn. The file wrapper furnishes no other clue to the proper interpretation of this word "stretched." Its natural meaning as applied to an elastic band would clearly seem to be that of intentional extension under tension.

Plaintiffs' construction of the word "stretched" in the claim gives it no functional meaning, and in effect reads it out of the claim. But this may not be done as it was put there by the applicant's attorney by amendment after claims otherwise drawn were rejected, and argument was submitted to the Patent Examiner which specifically refers to the amended wording and seems very plainly to give the meaning to the word which, in my opinion, it must here receive. Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 227, 26 L.Ed. 149; Smith v. Magic City Club, 282 U.S. 784, 789, 51 S.Ct. 291, 293, 75 L.Ed. 707; Heitler v. Brooklyn Shield & Rubber Co. (D.C.) 295 F. 333, 336. This point seems not to have been discussed by the District Court in the Jordan Marsh Case reported in 9 F.Supp. 516.

As the defendant's garment in this case on inspection does not contain the element of a stretched elastic band, the patent claim does not literally read on it; and therefore it cannot be found to infringe unless the plaintiffs' patent could be entitled to a much broader range of equivalents than is possible with a claim so narrowly limited. And if it be suggested that the basis for finding non-infringement is on a narrow ground, the answer is that the patent itself if valid at all is very narrowly limited to a minutely particular construction. Plaintiffs' counsel has well expressed his contention by saying that while he considers the patent legally strong, it is commercially very weak, because non-infringement will result from slight departures in construction which are not literally covered by the claims.

I find it unnecessary to decide whether the Boston garment also does not infringe, as there is no evidence in the case that this particular type of garment has been sold

142

by Stewart & Company, and the manufacturer, the Elliott Company, is not a party here.

For these reasons the bill of complaint must be dismissed with taxable court costs to be allowed to the defendant. I assume that in view of the full report of the case in the First Circuit and the discussion here, no more detailed findings of fact and conclusions of law will be needed. But if counsel desire them, they can be submitted for consideration.